UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NANCY A. STENCIL, et al.,

      Plaintiffs,

v.                                                          Case No. 22-cv-00305-LA

RONALD H. JOHNSON, et al.,

      Defendants.

**BRIEF OF AMICUS CURIAE WISCONSIN INSTITUTE FOR LAW & LIBERTY, INC. IN SUPPORT OF DEFENDANTS TIFFANY AND FITZGERALD'S MOTION TO DISMISS AND DEFENDANT JOHNSON'S MOTION TO DISMISS**

*"The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy."*

– *Bond v. Floyd*, 385 U.S. 116, 135-36 (1966)

## INTRODUCTION

The Plaintiffs have filed a federal complaint alleging that a series of social media posts by sitting members of Congress calling for election integrity constitutes "insurrection or rebellion" against the United States. U.S. Const. amend. XIV, § 3. Appearing to violate both Fed. R. Civ. P. 8(a)(2)'s commandment of a "short and plain statement of the claim" and Rule 12(f)'s prohibition on "immaterial, impertinent, or scandalous matter," the Plaintiffs dress their basic request that the Court penalize the political speech of elected legislators in 80 pages of florid prose alleging shadowy conspiracies. But nowhere do the Plaintiffs allege with any specificity that *these* Defendants broke any law or encouraged anyone else to do so. In an Orwellian invocation of "democracy," the Plaintiffs here want to prevent elected officials from running for re-election

because they have expressed opinions that the Plaintiffs believe to be wrong and unsupported. "To state such a case is to decide it." *Bartle v. Nutt*, 29 U.S. 184, 188 (1830).

This case should be dismissed.

## ARGUMENT

### A. Federal Pleading Standards

Under Fed. R. Civ. P. 8(a), "A pleading that states a claim for relief must contain . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." "To survive a motion to dismiss" under Fed. R. Civ. P. 12(b)(6) for failure to state a claim, then, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That is, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*[1]

This requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* It requires more than the pleading of facts "that are 'merely consistent with' a defendant's liability." *Id.* (quoting *Twombly*, 550 U.S. at 557). It requires more than "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (alteration in original). And, since courts need not accept as true asserted legal conclusions, it requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.*; *see also id.* at 678-79 (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions").

---

[1] In addition, under Rule 12(f) "[t]he Court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."

Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. As will be shown, common sense is sorely needed in this proceeding.

**B.     The Plaintiffs' Complaint Fails to State a Claim upon which Relief Can Be Granted**

Despite the prodigious length of the Plaintiffs' complaint, precious few facts relate to the Defendants (as opposed to non-defendants such as President Trump, Attorney General Bill Barr, Attorney Sidney Powell, the individuals who entered the capitol on January 6, 2021, the "fraudulent electors," etc.) And the vast majority of those few facts relate to protected speech by the Defendants shortly before and after the election. What remains cannot form the basis for a complaint alleging "insurrection or rebellion."

   ***i.     The Challenged Speech of the Defendants is Protected***

As it relates to the Defendants—the actual subjects of this lawsuit—most of the Complaint targets speech relating to the November 2020 election, including speech online, in interviews, and in writing. *See* Dkt. 1 at ¶¶37-38, 41, 64-65, 68, 72, 178, 182 (Fitzgerald); *id.* at 63, 66, 94-95, 103, 152-55, 178, 181 (Tiffany); *id.* at 71, 88-89, 99, 121-22, 129-31, 139, 141, 148-49, 178-80 (Johnson). The Plaintiffs themselves sheepishly admit as much. *See id.* at ¶¶13 ("Much of the Defendants' conduct presently known consists of words . . . ."); 56 ("[M]any of the crimes were accomplished primarily using words."). Words—like "here's how we are going to rob this bank" or "leave the ransom money in brown paper bags"—can effect criminal acts. But that's not what we have here. The speech the Plaintiffs target includes such dangerous and contemptible statements as the following:

- "Americans want a transparent process that counts every legally cast ballot." *Id.* at ¶63;

- "This is about the integrity of our system. Every legal vote must be counted, credible complaints of fraud and irregularities must be investigated, and legitimate legal challenges must be heard and addressed by our independent judiciary." *Id.* at ¶103;

- "I share the concern of my Republican colleagues that we don't want Congress coming in here and overturning the election or disenfranchising voters. I understand that. But we also can't just dismiss these legitimate concerns." *Id.* at ¶149.

Thus, the Plaintiffs' self-proclaimed strategy is to try to allege just enough to "unlock the doors of discovery," *Iqbal*, 556 U.S. at 678, so that they may go fishing. *See id.* at ¶3 ("[D]id Defendants engage or otherwise assist in the insurrection through the conduct alleged in this Complaint and their actions that will be revealed in discovery?"); *id.* at ¶186 ("[The Plaintiffs] further assert that the conduct attributed to the Defendants in this Complaint (and that which will be learned in discovery) constitutes engagement in the insurrection and/or the voluntary effort to assist the insurrection.").

But they fail. The challenged speech—by legislators, advocating for election integrity—is protected by the First Amendment.

Over 50 years ago, in *Bond v. Floyd*, 385 U.S. 116 (1966), the Supreme Court rejected a similar attempt to disqualify a legislator from holding office on the basis of political statements. In that case Julian Bond, a member of the Georgia House of Representatives, criticized both the draft and United States involvement in the Vietnam War in a telephone interview with a reporter. *Bond*, 385 U.S. at 121. Bond further endorsed a statement of the Student Nonviolent Coordinating Committee that, *inter alia*, declared that "for the most part, elections in this country, in the North as well as the South, are not free. . . . We question, then, the ability and even the desire of the United States government to guarantee free elections abroad." *Id.* at 118-22. In response, 75

Georgia House members challenged Bond's right to be seated, arguing that his statements "gave aid and comfort to the enemies of the United States and Georgia, violated the Selective Service laws, and tended to bring discredit and disrespect on the House," and were inconsistent with the required oath prescribed by the Constitution of Georgia and the required oath to support the federal constitution. *Id.* at 123. The Georgia House ultimately voted 184 to 12 that Bond could not be seated as a member. *Id.* at 125.

The Supreme Court held that the disqualification violated Bond's right of free expression under the First Amendment, rejecting any notion that Georgia could apply a stricter standard to its legislators. *Id.* at 133, 137. It explained:

> The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy. The central commitment of the First Amendment . . . is that "debate on public issues should be uninhibited, robust, and wide-open." . . . Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected.

*Id.* at 135-36 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964)).

This case is controlled by *Bond*. Similar to the House members in that case, the Plaintiffs are offended by political statements the Defendants made. Similar to the House members in that case, the Plaintiffs allege that engaging in the challenged speech betrays the country and disqualifies the speakers from holding office. But like the speech in *Bond*, the Defendants' speech—at most, criticizing the manner in which the 2020 election was conducted and calling for investigations and reform—is protected by the First Amendment.

Not only that; the speech is at the very *core* of what the First Amendment is meant to protect. *See, e.g., Mills v. State of Ala.*, 384 U.S. 214, 218 (1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This

5

of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes."); *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) ("Indeed, the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971))). The Plaintiffs' proposed rule that anyone who questions how an election in the United States is run is barred from holding public office is utterly foreign to our constitutional order.

But, the Plaintiffs may argue, this case is different than *Bond* because here there were others who may well have heard the Defendants' speech about the need to investigate fraud and to ensure that votes are properly counted and then engaged in unlawful conduct. In this view, because the Defendants, who were speaking shortly before and after the election, "should not" have thought allegations of fraud were credible or harbored any concerns about the 2020 elections, they are vicariously liable for the actions of those who agreed. This is preposterous. No case—at any time or in any place—has ever said so.

## ii. The Plaintiffs Do Not Plead Sufficient Factual Content to Show that the Defendants' Protected Speech was "Integral to Criminal Conduct"

The Plaintiffs attempt to avoid this massive First Amendment problem by asserting that "words integral to criminal conduct fall outside the scope of First Amendment protection." Dkt. 1 at ¶13. That is, "speech or writing used as an integral part of conduct in violation of a valid criminal statute" is not protected from prosecution simply because it is speech or writing. *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949); *cf. Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) (Congress can permissibly "prohibit employers from discriminating in hiring on the basis of race" even though such a law "will require an employer to take down a sign reading 'White Applicants Only'").

6

Importantly, this categorical speech-incident-to-crime exception is not a "free-floating test for First Amendment coverage" whereby this Court is to conduct an "ad hoc balancing of relative social costs and benefits" of the speech at issue. Instead, and for starters, the Plaintiffs must clearly identify the valid prohibition of criminal conduct that the Defendants supposedly violated with words like "Americans want a transparent process that counts every legally cast ballot." Dkt. 1 at ¶63.

Of course, the Plaintiffs are unable to do so. Words can be punished when they are used to effectuate a wrongful act. An employer who puts up a "Whites Only" sign is not expressing an opinion about race and employment; he is barring non-whites from applying for a job. A member of the Weather Underground who robs a bank and kills a security guard is not simply claiming that the Vietnam War was immoral or murderous; she is murdering someone. She is responsible for her act. A Senator or journalist who condemns the war in the sharpest of terms, in contrast—even if he or she is wrong or inaccurate—is not culpable for a terrorist's act.

The words spoken or written by the Defendants are not themselves criminal—they are protected political speech. The best the Plaintiffs can muster is to argue that the "*fraudulent electors*" (not parties here), in casting "alternate" electoral votes in contested states, violated statutes ranging from forgery to impersonation of a public officer. But the Plaintiffs do not allege that the Defendants committed any of this allegedly criminal conduct. Plaintiffs allege only that the Defendants (and others) "supported" these individual's actions—but importantly did so via their speech (and not through words directed to these third parties), namely comments to the public about election integrity. The Plaintiffs call this "express and/or tacit agreement" with these third parties. *Id.* at ¶¶47-48, 114.

There are many problems with this Rube Goldberg approach to attempting to punish the Defendants for their political expression. But set aside the fact that it is wholly probable that the

strategy of casting "alternate" electoral votes was a means of preserving legal options—whatever one might think of its wisdom or propriety—and does not violate the statutes as alleged. And set aside the fact that this is not a criminal proceeding in which the Defendants (or the alternate electors, for that matter) have been charged by the government. Regardless of those inconvenient facts, the Plaintiffs cannot tie protected political speech to the alleged criminal conduct of others in order to escape dismissal through a naked and unsupported allegation of "conspiracy." *Cf. Twombly*, 550 U.S. at 553 (to state a claim for conspiracy in restraint of trade or commerce in antitrust action under § 1 of the Sherman Act, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice . . . a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality").

Here the Plaintiffs have provided no evidence of such a conspiracy to commit a crime. Aside from challenging core political speech, the Defendants largely point to two categories of other facts: mere receipt of memoranda, briefings, or presentations, Dkt. 1 at ¶¶98, 122, 126, 132, 143, 150-51, 156[2]; and official acts in Congress, *id.* at ¶¶122, 176. Neither of these sets of facts indicate an agreement, tacit or otherwise, to do anything. For example, the Plaintiffs allege that Defendant Johnson virtually attended a January 4, 2021 meeting at the Trump International Hotel. *Id.* at ¶¶150-51. So what? The Complaint alleges this meeting was "to discuss potentially delaying Biden's election certification." *Id.* at ¶150. But the Complaint does not allege that this was actually discussed (and indeed suggests the opposite, *id.* at ¶151); does not allege that Johnson (or anyone else) agreed to do anything; and in fact notes that any discussion of delay was tentative ("potential[]"), *id.* at ¶150. This is no basis on which a Court can conclude that Defendant Johnson

---

[2] The Complaint also alleges that Defendant Tiffany attended a "closed-door rally" following January 6 but does not allege anything occurred at that rally relating to the electors. Dkt 1 at ¶181.

conspired to commit a crime of any sort or even that Defendant Johnson said or did anything (much less anything criminal) at the meeting.

The Plaintiffs also allege that Defendant Fitzgerald "reserved meeting space in the State Capitol on December 14, 2020 for the Republican Party of Wisconsin" and "facilitated" a "security detail" for them. *Id.* at ¶¶101, 113. Again, so what? The Plaintiffs allege that it was at that meeting that the "fraudulent electors" met to cast their "alternate" votes. *Id.* at ¶¶101-102; *see id.* at ¶8. But once again, nowhere is it alleged that Defendant Fitzgerald said anything or agreed to do anything at the meeting or actually engaged in criminal conduct. As explained above, to survive a motion to dismiss the Plaintiffs must do more than plead facts "that are 'merely consistent with' a defendant's liability," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557), and must assert "more than a sheer possibility that a defendant has acted unlawfully," *id.* A room reservation is not criminal.

In sum, nowhere in their complaint are the Plaintiffs able to allege facts that support a conclusion that the Defendants' protected political speech was speech "integral to criminal conduct," which is why the Plaintiffs quietly concede that "it is plausible that some of the conspirators"—read: the Defendants—"never met to discuss or expressly agree to the conspiracy." *Id.* at ¶48. And in the absence of the ability to penalize the Defendants' speech, the Plaintiffs' legal theory collapses: do they really expect a Court to conclude that official acts in Congress and the receipt of legal memoranda constitute "insurrection or rebellion" against the United States on par with the actions of the Civil War Confederates?

This case should be dismissed.

## CONCLUSION

The irony of this case is completely lost on the Plaintiffs. They purport to abhor attacks on the democratic process and the values our country holds dear. Yet they have filed a federal lawsuit

9

seeking to unseat and disqualify duly-elected representatives on the basis of their political speech. Much as the Plaintiffs might wish otherwise, Americans are allowed to ask questions about the manner in which elections are held.[3] They are even allowed to call elections illegitimate or stolen, if they wish.[4] Far from disqualifying these speakers from office, the First Amendment safeguards their opinions from government penalty.

The Plaintiffs' complaint is insufficient to state a cause of action against the Defendants. For the foregoing reasons, *Amicus* Wisconsin Institute for Law & Liberty, Inc. respectfully requests that this Court dismiss this case with prejudice.

Dated this 13th day of May, 2022.

Respectfully submitted,

/s/ Anthony F. LoCoco
Richard M. Esenberg, WI Bar No. 1005622
(414) 727-6367; rick@will-law.org
Anthony F. LoCoco, WI Bar No. 1101773
(414) 727-7419; alococo@will-law.org
WISCONSIN INSTITUTE FOR LAW & LIBERTY, INC.
330 E. Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
(414) 727-9455; FAX: (414) 727-6385
*Attorneys for Amicus Curiae*

---

[3] Contrary to the Plaintiffs' insinuations otherwise, there is plenty of room for sincere criticism of the 2020 election. *See generally, e.g.*, Will Flanders et al., *A Review of the 2020 Election*, Wisconsin Institute for Law & Liberty, Inc. 9-16 (Dec. 2021), *available at* https://will-law.org/wp-content/uploads/2022/04/2021ReviewStudy-V1.02.pdf.

[4] Indeed, the tradition of doing so is bipartisan. *See, e.g.*, Colby Itkowitz, *Hillary Clinton: Trump is an 'illegitimate president'* (Sept. 26, 2019) ("Hillary Clinton dismissed President Trump as an 'illegitimate president' and suggested that 'he knows' that he stole the 2016 presidential election in a CBS News interview to be aired Sunday."), *available at* https://www.washingtonpost.com/politics/hillary-clinton-trump-is-an-illegitimate-president/2019/09/26/29195d5a-e099-11e9-b199-f638bf2c340f_story.html. *Amicus* suspects the Plaintiffs did not sue in 2019 to disqualify the former secretary of state from holding political office.