# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### (MILWAUKEE DIVISION)

| | |
|---|---|
| NANCY A. STENCIL, DANIEL C. RUSSLER, LISA C. MUELLER, CHERYL L. MARANTO, GERARD D. LISI, JAMES B. KURZ, MARGARET L. DEMUTH, PAUL DEMAIN, JAMES R. BOTSFORD AND RICHARD BECHEN, <br><br> Plaintiffs, <br><br> vs. <br><br> RONALD H. JOHNSON, THOMAS P. TIFFANY, AND SCOTT L. FITZGERALD, <br><br> Defendants. | Case No. 22-cv-305 |

## PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION TO DISMISS OF DEFENDANT RONALD H. JOHNSON

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ....................................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................................... 4

ARGUMENT ............................................................................................................................... 7

I.      PLAINTIFFS HAVE THE RIGHT TO SUE DEFENDANTS. ......................................... 7

II.     PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS. .............................. 10

        A.      This Court May Go Beyond the Complaint to Evaluate Standing........................ 10

        B.      Plaintiffs' Status as Activist Voters Asserting Their First Amendment
                Rights Establishes That They Have Standing. ...................................................... 11

        C.      Standing is Not a Hypertechnical Requirement That Provides an Excuse to
                Close Courthouse Doors. ...................................................................................... 13

                1.      A Widely Shared Injury Can Be "Particularized." ................................... 13

                2.      Even Minor Injuries Fully Establish Standing. ......................................... 13

                3.      Diversion of Time and Resources Establishes an Injury for
                        Standing Purposes. .................................................................................... 14

        D.      Plaintiffs Establish Injury-In-Fact ....................................................................... 16

        E.      Plaintiffs Assert a Causal Relationship Between Defendants'
                Insurrectionist Acts and Their Injuries. ................................................................ 17

        F.      Plaintiffs Assert Injuries that This Court Can Redress. ....................................... 18

III.    ARTICLE I, SECTION 5 OF THE CONSTITUTION DOES NOT DIVEST
        THIS COURT OF JURISDICTION. ................................................................................. 19

IV.     THE AMNESTY ACT OF 1872 DOES NOT APPLY TO SENATOR
        JOHNSON. ....................................................................................................................... 24

V.      PLAINTIFFS' PROPERLY SEEK A DECLARATION THAT WILL BENEFIT
        THEM BY GIVING THEM A REMEDY. ....................................................................... 27

CONCLUSION .......................................................................................................................... 28

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGES**

*American Civil Liberties Union v. City of St. Charles*
   794 F.2d 265 (7th Cir. 1986) ..........................................................................14, 16

*Armstrong v. Exceptional Child Ctr., Inc.*
   135 S. Ct. 1378 (2015)......................................................................................7, 8

*Barry v. U.S. ex rel. Cunningham*
   279 U.S. 597 (1929).......................................................................................20, 21

*Biden v. Knight First Amendment Inst. at Columbia Univ.*
   141 S.Ct. 1220 (2021)........................................................................................18

*Bill Johnson's Restaurants, Inc. v. NLRB*
   461 U.S. 731 (1983)...........................................................................................12

*Cable News Network, Inc. v. Trump*
   No. 1:18-cv-02610-TJK, 2018 WL 9436958 (D.D.C., Nov. 26, 2018)....................8

*California Motor Transp. Co. v. Trucking Unlimited*
   404 U.S. 508 (1972)...........................................................................................12

*Capitol Leasing Co. v. F.D.I.C.*
   999 F.2d 188 (7th Cir. 1993) ..............................................................................10

*Carr v. United States*
   560 U.S. 438 (2010)...........................................................................................26

*Cawthorn v. Circosta*
   2022 WL 738073 (E.D.N.C., Mar. 10, 2022) .................................................26, 27

*Common Cause Indiana v. Larson*
   937 F.3d 944 (7th Cir. 2019) .........................................................................15, 16

*Consumer Data Indus. Ass'n v. King*
   678 F.3d 898 (10th Cir. 2012) ............................................................................18

*Crawford v. Marion County Election Board*
   472 U.S. 949 (7th Cir. 2007) .....................................................................14, 15, 16

*Doe v. County of Montgomery*
   41 F.3d 1156 (7th Cir. 1994) ..............................................................................13

*Donovan v. Eagleson*
   484 F.Supp. 3d 552 (N.D. Ill. 2020) ...................................................................10

*Eastman v. Thompson*
   No. 8:22-cv-00099-DOC-DFM, 2022 WL 894256 (C.D. Cal., March 28, 2022)....................1

*Evers v. Astrue*
   536 F.3d 651 (7th Cir. 2008) ....................................................................................10

*Fauley v. Drug Depot, Inc.*
   204 F.Supp. 3d 1008 (N.D. Ill. 2016) ......................................................................10

*Getty Images News Services Corp. v. Dep't of Defense*
   193 F.Supp. 2d 112 (D.D.C. 2002) ............................................................................8

*Greene v. Raffensperger*
   No. 22-cv-1294-AT, 2022 WL 1136729 (N.D. Ga., April 18, 2022)............................ *passim*

*Gundy v. United States*
   139 S. Ct. 2116 (2019)..............................................................................................26

*Hassan v. Colorado*
   495 F. App'x 947 (10th Cir. 2012) ...........................................................................22

*Hutchinson v. Miller*
   797 F.2d 1279 (4th Cir. 1986) .................................................................................22

*Hutchinson v. Proxmire*
   443 U.S. 111 (1979)...................................................................................................6

*In re Griffin*
   11 F. Cas. 7 (C.C.D. Va. 1869)...........................................................................9, 10

*JB Pictures, Inc. v. Dep't of Defense*
   86 F.3d 236 (D.C. Cir. 1996) .....................................................................................8

*Karem v. Trump*
   960 F.3d 656 (D.C. Cir. 2020) ...................................................................................8

*Knight First Amendment Inst. at Columbia Univ. v. Trump*
   302 F.Supp. 3d 541 (S.D.N.Y. 2018).......................................................................18

*Krislov v. Rednour*
   226 F.3d 851 (7th Cir. 2000) ..............................................................................18, 19

*Lac du Flambea Band of Lake Superior Chippewa Indians v. Norton*
   422 F.3d 490 (7th Cir. 2005) ...................................................................................11

*LaFleur v. Whitman*
   300 F.3d 256 (2d Cir. 2002)......................................................................................13

Case 2:22-cv-00305-LA   Filed 05/13/22   Page 4 of 36   Document 39

*Larson v. Valente*
    456 U.S. 228 (1982) ................................................................................28

*Leung v. XPO Logistics, Inc.*
    164 F.Supp. 3d (N.D. Ill. 2015) ........................................................14, 16

*Lindsay v. Bowen*
    750 F.3d 1061 (9th Cir. 2014) ..............................................................22

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992) ................................................................................17

*Lyons v. Sundquist*
    41 F. App'x 832 (6th Cir. 2002) ............................................................21

*Marshall v. Town of Merrillville*
    228 F.Supp. 3d 853 (N.D. Ind. 2017) .......................................13, 14, 16

*Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co.*
    649 F.3d 539 (7th Cir. 2011) ................................................................19

*McCutcheon v. Federal Election Comm'n*
    572 U.S. 185 (2014) ................................................................................12

*McIntyre v. Fallahay*
    766 F.2d 1078 (7th Cir. 1985) ..............................................................20

*Minn-Chem, Inc. v. Agrium, Inc.*
    683 F.3d 845 (7th Cir. 2012) ..........................................................10, 11

*Monitor Patriot Co. v. Roy*
    401 U.S. 265 (1971) ................................................................................12

*Morgan v. United States*
    801 F.2d 445 (D.D.C. 1986) ..................................................................20

*Munro v. Socialist Workers Party*
    479 U.S. 189 (1986) ................................................................................22

*N.A.A.C.P. v. Am. Fam. Mut. Ins. Co.*
    978 F.2d 287 (7th Cir. 1992) ..................................................................9

*Pinkerton v. United States*
    328 U.S. 640 (1946) ..................................................................................2

*Powell v. McCormack*
    395 U.S. 486 (1969) ........................................................................20, 27

v

*Public Citizen v. U.S. Dep't of Justice*
    491 U.S. 440 (1989).................................................................13

*Roudebush v. Hartke*
    405 U.S. 15 (1972).............................................................21, 24

*Sierra Club v. Franklin County Power of Illinois, LLC*
    546 F.3d 918 (7th Cir. 2008)..................................................13

*Smadi v. True*
    Case No. 18-cv-02149-JPG, 2021 WL 2853262 (S.D. Ill., July 8, 2021)..............8

*Smiley v. Holm*
    285 U.S. 355 (1932).............................................................21

*United Phosphorus, Ltd. v. Angus Chemical Co.*
    322 F.3d 942 (7th Cir. 2003)..............................................10, 11

*U.S. v. Barefield*
    6 F.App'x 351 (7th Cir. 2001)..................................................2

*U.S. v. Brewster*
    408 U.S. 502 (1972)..............................................................6

*U.S. v. Doyle*
    121 F.3d 1078 (7th Cir.1997)....................................................2

*U.S. Term Limits v. Thornton*
    514 U.S. 779 (1995).............................................................22, 27

*Zwickler v. Koota*
    389 U.S. 241 (1967).............................................................17

## CONSTITUTION AND STATUTES      PAGES

U.S. Const., Art. I, § 4 ......................................................................19, 21

An act to award four congressional gold medals to the United States Capitol Police and those
   who protected the U.S. Capitol on January 6, 2021,
    Pub. L. No. 117-32, 135 Stat. 322, 323 and 324 (Aug. 5, 2021) ..............6

Act of May 22 (The Amnesty Act of 1872),
    Pub. L. No. 42-193, 17 Stat. 142 (1872).....................................24, 25

Wis. Stat. § 5.05(2) .......................................................................17

Wis. Stat. § 5.05(2m) ....................................................................17

Wis. Stat. § 5.06 ...........................................................................17

Wis. Stat. § 8.21(2)(a-c) ..........................................................................20

Wis. Stat. § 8.21(2)(c) .......................................................................17, 18

**OTHER AUTHORITIES**                                                 **PAGES**

Business Insider, *GOP Sen. Ron Johnson falsely described the Capitol insurrection as
'by and large a peaceful protest' on Fox News* (last accessed May 13, 2022)
https://www.cnn.com/2022/04/27/opinions/gop-blueprint-to-steal-the-2024-election-
luttig/index.html ..........................................................................5

Cannon, Clarence, A.M., LL.B., LL.D., *Cannon's Precedents of the House of
Representatives of the United States, Volume VI*
6 Clarence Cannon 55 (1935) ...........................................................26

The Congressional Globe,
42nd Congress, 2nd Session 3381 (1872) ............................................25

Magliocca, Gerald N., *Amnesty and Section Three of the Fourteenth Amendment*
36 Constitutional Commentary 87 (2021) .................................9, 10, 25

Merriam-Webster, "spin" (last accessed May 13, 2022)
https://www.merriam-webster.com/dictionary/spin?utm_campaign=sd
&utm_medium=serp&utm_source=jsonld ...........................................5

U.S. Embassy in Poland, *President Obama: The Peaceful Transition of Power is One of
the Hallmarks of our Democracy* (last accessed May 13, 2022)
https://pl.usembassy.gov/obama_election2016/ ....................................5

Wisconsin Elections Commission, Candidate Tracking by Office, 2022 General Election,
11/8/22 (last accessed May 13, 2022)
https://elections.wi.gov/sites/elections/files/2022-
05/Candidates%20Tracking%20By%20Office%20as%20of%205.11.2022.pdf ................20

## INTRODUCTION

Defendant Ronald H. Johnson claims that this "case is a coordinated ruse by operatives of the Democratic party to score political points ahead [of] the 2022 midterm elections," and suggests the 187-paragraph Complaint alleges a "risible farce that Defendants—three Members of Congress who are up for reelection in November—engaged in insurrection against the United States." (Def. Br. 1.) Rather than answer the Complaint and allow for discovery to reveal the facts, Johnson implores the Court to avoid a "mortgage" on its "credibility" and instead invokes a litany of legal defenses that do not stand up to scrutiny. (*Id*.)

It's easy for Johnson to impugn Plaintiffs the same way he does his opponents in his campaign ads, but this lawsuit, like all others, arises from actual facts and a legal theory. Johnson asserts that the factual allegations are a "farce," but Johnson conveniently ignores the federal courts that have already decided that the actions of President Trump and his co-conspirators (which in Plaintiffs' view includes all three Defendants) amount to more than just politics as usual. A branch of the District Court for the Central District of California said it well six weeks ago:

> Dr. Eastman and President Trump launched a campaign to overturn a democratic election, an action unprecedented in American history. Their campaign was not confined to the ivory tower—**it was a coup in search of a legal theory**. The plan spurred violent attacks on the seat of our nation's government, led to the deaths of several law enforcement officers, **and deepened public distrust in our political process**.

*Eastman v. Thompson*, 2022 WL 894256, Case No. 8:22-cv-00099-DOC-DFM, *27 (C.D. Cal. March 28, 2022) (emphasis added). In the *Eastman* court's view, "it is more likely than not that President Trump and Dr. Eastman **dishonestly conspired** to obstruct the Joint Session of Congress on January 6, 2021." *Id*. at *24 (emphasis added).

Johnson's role in this criminal conspiracy was to deploy lies and deceptive statements from his bully pulpit as a sitting United States Senator to foment public distrust in the outcome of the

1

2020 election as a means to bring public pressure on Vice President Mike Pence on January 6, 2021 when the electoral votes were counted. (Compl., ¶¶ 1-13, 34, 49, 93, 122.) In a criminal conspiracy, Johnson would be held accountable not only for those "acts of the conspiracy in which he personally participated, but also for all acts of his co-conspirators undertaken in furtherance of the conspiracy and reasonably foreseeable to him." *U.S. v. Barefield*, 2001 WL 300714, No. 00-2085, *2 (7th Cir. March 27, 2001) (citing *Pinkerton v. United States*, 328 U.S. 640 (1946) and *U.S. v. Doyle*, 121 F.3d 1078, 1091 (7th Cir.1997)). With this in mind, Plaintiffs ask a simple question: does the conduct attributed to Johnson in the Complaint (and later revealed through discovery) amount to insurrection under Section 3 of the Fourteenth Amendment?

We know **Johnson himself knew** he was spreading vicious lies about the outcome of the 2020 election because Johnson himself admitted it on November 14, 2020 in a 30-minute phone conversation with his friend and Republican colleague Mark Becker, now a writer for *The Bulwark*. (Compl., ¶ 89.) In Becker's telling, Johnson knew that President Biden "won a free and fair election" but he was "refusing to admit it publicly and stoking conspiracies that undermine our democracy solely because it would be 'political suicide' to oppose Trump." (*Compl.*, ¶ 89(a).) This is why Johnson does nothing to rebut the facts alleged in the Complaint and instead turns to a series of legal arguments that he suggests should end this case before it starts. All of the legal arguments Johnson advances in his motion to dismiss fail.

First, Johnson argues there is no private right of action to enforce Section 3 of the Fourteenth Amendment because Section 5 of that amendment requires legislation by Congress for Plaintiffs to proceed. Johnson's adherence to pleading formalism aside, the Supreme Court has long held that federal courts may protect First Amendment rights like those asserted by Plaintiffs in this case against deprivations effected by Federal officials.

Second, Defendant argues that Plaintiffs have no standing to sue because they have done nothing more than express generalized grievances that cannot serve as a basis for standing. This ignores the actual injury Plaintiffs suffer when forced to address Johnson's qualifications and his conduct in violation of Section 3 rather than advocating for other policy issues of concern to them, as well as Plaintiffs' First Amendment right to challenge a candidate's eligibility for the ballot.

Third, Johnson disdains the authority provided to Wisconsin and its sister states under Article I, Section 4 of the Constitution by insisting that Article I, Section 5 gives Congress plenary power over who is qualified to be a member of the U.S. Senate. Yet not a single case relied on by Johnson supports the idea that Congress has such authority **before an election.** With good reason: ballot access issues **before an election** are enforced by the states under Article I, Section 4. Johnson must submit a sworn Declaration of Candidacy under Wisconsin law stating he is qualified to seek the office he is pursuing, and he cannot truthfully do that if he is found to have engaged in insurrection in violation of Section 3. Because an answer to this question will personally bind Johnson to the Court's judgment on Plaintiffs' claim, any declaration will necessarily affect Johnson's access to the ballot because it impacts how he submits (or amends) his Declaration of Candidacy in Wisconsin. As a result, entry of a declaratory judgment by this Court is neither an advisory opinion nor an intrusion on a political question.

Fourth, unlike his co-defendants, Johnson insists that the disabilities imposed by Section 3 of the Fourteenth Amendment on running for state or federal office were removed in the Amnesty Act of 1872. As shown below, this argument fails on a textual basis. But it's worse than that: Johnson is actually asserting that legislation from Congress can render null a constitutional amendment ratified by more than three-fourths of the states. That position turns constitutional law on its head.

3

Finally, Johnson asserts that Plaintiffs are misusing the Declaratory Judgment Act as they try to weaponize their Disqualification Clause claim into a right. Not true. We show below that the labels placed on the allegations in the Complaint do not matter. What matters is the wrong that Plaintiffs seek to redress. In this instance, a declaration from this Court will redress Plaintiffs' First Amendment injury, allowing them to focus their political activism on the policy issues that matter to them rather than debunking "The Big Lie" and speaking out against those who continued to support it. So long as the air remains clouded by a failure to resolve the constitutional questions that Plaintiffs have raised, their rights are being impaired.

For all these reasons, and those described more fully below and in Plaintiffs' Brief in Opposition to Motion to Dismiss of Defendants Thomas P. Tiffany and Scott L. Fitzgerald (Dkt. 23), Plaintiffs respectfully request the Court deny the motion to dismiss in its entirety and set this matter for expedited discovery and a hearing on the merits.

## FACTUAL BACKGROUND

Johnson's motion to dismiss summarizes this action as follows:

> On March 10, 2022, Plaintiffs filed an 80-page, 187-paragraph complaint that wildly spins Senator Johnson's and the House Defendants legitimate concerns about the integrity and security of the 2020 Presidential Election into a conspiracy of insurrection and rebellions against the United States.

(Def. Br. 3.) As a preliminary matter, the Senator's bluster requires some clarification. First, the 80 pages and 187 paragraphs of Plaintiffs' Complaint are packed with **indisputable facts** pulled straight from the public record—not "wild spin." Rather than address those facts or try to refute them, Johnson opts for the strategy perfected by his political idol Donald J. Trump: mischaracterize the facts and belittle his opponents. Indeed, the Introduction and Factual Background sections of Johnson's brief are rife with unfounded *ad hominem* attacks against so-called "operatives of the Democratic party" for advancing "conspiracy theories" based on "political motivations" (Def. Br.

1) and a string cite of whataboutisms (Def. Br. 3-4) intended to distract from the real issue: whether Johnson's actions between Election Night 2020 and Inauguration Day amount to insurrection.[1]

Second, as a seasoned politician, Johnson's misuse of the term "spin" is both tone-deaf and ironic.[2] Facts are not "spin." Spin is saying that the January 6 attack on the Capitol "didn't seem like an armed insurrection to me" (Compl., ¶ 179) and instead describing it as a "peaceful protest" (*see* Johnson interview on Fox News, May 19, 2021)[3]. Spin is calling the rioters who assaulted Capitol Police and breached the Capitol Building "left-wing agitators who were impersonating Trump supporters" (Compl., ¶ 179) and later (when it became clear that all of the indicted rioters were, in fact, Trump supporters) backtracking and calling them "people that love this country, that truly respect law enforcement, [and] would never do anything to break a law" (Compl., ¶ 180). Notably, despite this rhetorical smokescreen, with near-unanimity Congress passed a bill that President Biden signed into law authorizing four gold medals to honor the Capitol Police and

---

[1] While Johnson is right that some Democrats were highly concerned when Donald Trump won the presidency in 2016, there is no evidence to suggest that anyone in the Democratic Party engaged in a nefarious conspiracy to set aside Trump's achievement like the one alleged here. Indeed, President Obama took the **exact opposite** approach in a speech on November 9, 2016: "Now, it is no secret that the President-elect and I have some pretty significant differences. But remember, eight years ago, President Bush and I had some pretty significant differences. But President Bush's team could not have been more professional or more gracious in making sure we had a smooth transition so that we could hit the ground running. And one thing you realize quickly in this job is that the presidency, and the vice presidency, is bigger than any of us. So I have instructed my team to follow the example that President Bush's team set eight years ago, and work as hard as we can to make sure that this is a successful transition for the President-elect—because we are now all rooting for his success in uniting and leading the country. The peaceful transition of power is one of the hallmarks of our democracy. And over the next few months, we are going to show that to the world." (*See President Obama: The Peaceful Transition of Power Is One of the Hallmarks of our Democracy*, https://pl.usembassy.gov/obama_election2016/, last accessed May 13, 2022.) Even Johnson once agreed with this ideal. (Compl., ¶ 89(c).)

[2] One of the common meanings of "spin" is "to engage in spin control (as in politics)." (*See* https://www.merriam-webster.com/dictionary/spin?utm_campaign=sd&utm_medium=serp&utm_source=jsonld; last accessed May 13, 2022.)

[3] *See* https://www.businessinsider.com/video-sen-ron-johnson-capitol-insurrection-peaceful-protest-watch-2021-5 last accessed May 13, 2022.

others who protected the Capitol on January 6, 2021 from "a mob of insurrectionists." Pub. Law. 117-32 (Aug. 5, 2021).

Substantively, Johnson's pithy factual rebuttal to the Complaint fares no better. His attempt to spit-shine Plaintiffs' assertions of his anti-American actions and present them as normal legislative activities protected by the Speech or Debate Clause[4] omits several key facts. For example, Johnson acknowledged on November 14, 2020 that President Biden had beaten Trump in a "free and fair election" but Johnson was nevertheless intentionally "stoking conspiracies that undermine our democracy solely because it would be 'political suicide' to oppose Trump." (Compl., ¶ 89.) Assuming that fact is true (as this Court must do on a motion to dismiss), all of Johnson's subsequent actions, including the much hyped but ultimately inconclusive hearing on "election irregularities" that he chaired on December 16, 2020 (Compl., ¶¶ 99, 121-22), must be viewed as non-privileged political theater, rather than legitimate legislative activity deserving of protection under the Speech or Debate Clause. The particulars of the hearing itself confirm this conclusion, because Johnson was briefed before the hearing by Retired Colonel Phil Waldron, who later circulated a PowerPoint to Republican members of Congress explaining how to overturn the election (Compl., ¶¶ 122, 156), and Johnson's star witness was attorney James Troupis, who simply recounted the same unsupported conspiracy theories that Wisconsin's conservative

---

[4] The Speech or Debate Clause may provide a legal privilege in connection with **legislative** activities, but the allegations of the Complaint deal primarily with Johnson's **political** activity. *See U.S. v. Brewster*, 408 U.S. 502 (1972) (Court distinguished between "purely legislative activities," which the Speech and Debate Clause protects, and merely political activities, which are unprotected by the Clause). In *Hutchinson v. Proxmire*, 443 U.S. 111 (1979), the Court ruled that the Speech or Debate Clause did not immunize a United States Senator from liability for defamation for statements made in newsletters and press releases because neither the newsletters nor the press release were "essential to the deliberations of the Senate" and neither was a part of the deliberative process. Moreover, the Court concluded that whatever imprecision there may be in the term "legislative activities," it is clear that nothing in the history or explicit language of the Clause suggests any intention to create an absolute privilege from liability or suit for defamatory statements made outside the chamber, in that the immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators.

Supreme Court had summarily rejected just two days earlier (Compl., ¶ 122). Troupis, of course, had relied on research and strategy provided by Kenneth Chesebro, one of the early advocates calling for Wisconsin and other key states to submit alternate slates of electors, whose instructions were followed to the letter by Wisconsin's own fraudulent electors, with the assistance of Johnson's co-defendant Scott Fitzgerald. (Compl., ¶¶ 80-82, 96-98, 101.)

In other words, Plaintiffs have more than met their factual burden at this stage of the case. The allegations of the Complaint, accepted as true, clearly demonstrate that Johnson's repeated use of his media access and bully pulpit to promote "The Big Lie," **despite** knowing it was just that—a lie—is blatantly partisan political activity that is neither privileged nor protected by the Speech or Debate Clause.[5]

## ARGUMENT

## I. PLAINTIFFS HAVE THE RIGHT TO SUE DEFENDANTS.

Johnson boldly asserts that there is "no private right of action to enforce [Section 3's] Disqualification Clause" (Def. Br. 1)—yet he cites no case law directly on point, because none exists. His assertion contradicts the Supreme Court's recognition that it has

> long held that federal courts may in some circumstances grant injunctive relief[6]
> against state officers who are violating, or planning to violate, federal law. But that
> has been true not only with respect to violations of federal law by state officials,
> but also with respect to violations of federal law by federal officials . . . . The ability
> to sue to enjoin unconstitutional actions by state and federal officers is the creation
> of courts of equity, and reflects a long history of judicial review of illegal executive
> action, tracing back to England.

---

[5] Hours before this brief was due to be filed, the Wisconsin Institute for Law & Liberty ("WILL") moved for leave to file an amicus brief in this case. WILL's brief focuses on alleged First Amendment deficiencies plaguing Plaintiffs' claim—arguments that were not raised in either of the briefs filed by the actual defendants. Whether or not this was a coordinated effort to get around page limits, Plaintiffs will address this issue in response to WILL's motion. Nevertheless, it is enough to note here that the Complaint adequately alleges how the First Amendment does not protect Defendants here. (Compl., ¶¶ 13, 51-62.)

[6] Plaintiffs here seek declaratory relief and not an injunction; for purposes of Johnson's "private enforcement" argument, there is no practical difference.

*Armstrong v. Exceptional Child Ctr., Inc*., 135 S. Ct. 1378, 1384 (2015).

Consistent with this fundamental principle, federal courts have routinely ruled that individuals aggrieved by federal action that violates a Constitutional right may invoke federal jurisdiction to seek declaratory or injunctive relief against the offending federal defendants. *See, e.g.*, *Smadi v. True*, Case No. 18-cv-02149-JPG, 2021 WL 2853262 at *4-5 (S.D. Ill., July 8, 2021) (although a federal prisoner has no *Bivens* damages claim against federal prison officials for violating the First Amendment by interfering with prisoner's mail, he was entitled to seek declaratory relief for the claimed First Amendment violation); *Cable News Network, Inc. v. Trump*, No. 1:18-cv-02610-TJK, 2018 WL 9436958 at 4-5 (D.D.C., Nov. 26, 2018) (transcript of oral decision granting temporary restraining order prohibiting federal officials from revoking reporter's White House press pass because Fifth Amendment requires that due process be observed before government can restrict reporter's First Amendment rights); *Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020) (suspension of reporter's White House press pass "implicates important first amendment rights" such that district court's decision granting injunction against suspension based on Fifth Amendment's procedural protections for First Amendment rights was affirmed); *Getty Images News Services Corp. v. Dep't of Defense*, 193 F.Supp. 2d 112, 119 (D.D.C. 2002) (recognizing that First Amendment "equal access claims by the press warrant careful judicial scrutiny" but denying injunctive relief that would have granted preferential access to detention facilities at Guantanamo Bay); *JB Pictures, Inc. v. Dep't of Defense*, 86 F.3d 236, 238-40 (D.C. Cir. 1996) (recognizing First Amendment claim seeking access to military base where caskets of deceased service members were received but denying claim on merits).

The district court in *Greene v. Raffensperger*, No. 22-cv-1294-AT, 2022 WL 1136729, *18 (N.D. Ga., April 18, 2022) expressly recognized "citizens' own First Amendment rights to file

complaints regarding the operation of the electoral process that the Challenge Act recognizes." The "citizens" in *Greene*, of course, raised the very same objection to Representative Marjorie Taylor Greene's presence on the ballot in Georgia that Plaintiffs are raising here against Senator Johnson: namely, that those legislators' participation in the illegal scheme to replace or ignore lawfully-chosen members of the Electoral College means that they committed insurrection within the meaning of Section 3 and therefore should be stricken from the ballot under the controlling provisions of state law. We describe additional First Amendment grounds for the Plaintiffs' claims in Section II of this brief.

Moreover, it is irrelevant that the Complaint does not mention the First Amendment. Plaintiffs are not required to plead legal theories. "A complaint should limn the grievance and demand relief. It need not identify the law on which the claim rests, and different legal theories therefore do not multiply the number of claims for relief." *N.A.A.C.P. v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992).

The principal argument that Johnson presents to support his "no private right of action" contention (Def. Br. 8) appears to be the decision by Chief Justice Chase, sitting as a circuit court judge in *In re Griffin*, 11 F. Cas. 7 (C.C.D. Va. 1869), issued at a time when Virginia was not yet readmitted to the Union and thus was not a state. Although Johnson's brief several times cites Gerald Magliocca's magisterial article on the history of Section 3 and the amnesty statutes passed in its wake (Def. Br. 4, 9), it is easy to understand why Johnson ignores Magliocca's conclusions about the reasoning and effect of *Griffin*:

> On balance, Chase's claim that Section Three was not self-enforcing [that is, that Congress was required to pass a statute before anyone could take action to classify another person as an "insurrectionist" subject to the disqualification imposed by Section 3] is unpersuasive. First. Section Three contains the same mandatory language ("No person shall") as Section One [of the Fourteenth Amendment] ("No state shall") and there is no doubt that Section One is self-executing. Second,

> nothing indicates that Congress saw Section Three as anything other than self-
> executing when the Fourteenth Amendment was drafted. Third, the practical
> problems that the Chief Justice sought to avoid were based on speculation. . . .
> Fourth, the inconsistency between the 1787 Constitution's criminal law provisions
> (for example, the Ex Post Facto Clause) and Section Three occur only if Section
> Three is characterized as a punishment, which is not the only plausible reading.
> Finally, the fact that Congress legislated about Section Three did not (as the Chief
> Justice said at one point) strongly imply that Section Three required legislation.

Gerald Magliocca, *Amnesty and Section Three of the Fourteenth Amendment*, 36 Constitutional

Commentary 87, 106 (2021). And there is an even more important reason why *Griffin* cannot

control here: this case is about ballot eligibility for the 2022 elections to the 118th Congress, not

about Johnson's right to continue in the 117th Congress; it challenges the right to **run**, not the right

to **serve**. When *Griffin* was decided in 1869, Virginia had not yet been readmitted to the Union,

and thus the provisions of Article I, Section 4 granting the states broad powers to regulate and

conduct elections (discussed in detail in Section III of this brief) could not have been relevant. It

would be anomalous and inconsistent with our Constitutional system for a court to hold that

Congress must enact legislation to govern a state's processes of administering ballot access.

## II.     PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS.

### A.     This Court May Go Beyond the Complaint to Evaluate Standing.

"When a party raises the issue of subject matter jurisdiction, '[t]he district court may

properly look beyond the jurisdictional allegations of the complaint and view whatever evidence

has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'"

*Fauley v. Drug Depot, Inc.*, 204 F.Supp. 3d 1008, 1009 (N.D. Ill. 2016) (quoting *Evers v. Astrue*,

536 F.3d 651, 656-57 (7th Cir. 2008)); *see also Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191

(7th Cir. 1993); *Donovan v. Eagleson*, 484 F.Supp. 3d 552, 555 (N.D. Ill. 2020). Like his co-

defendants, Johnson moves under Fed. R. Civ. P. 12(b)(1), asserting that the lack of standing

deprives this Court of subject matter jurisdiction. "The burden of proof on a 12(b)(1) issue is on

the party asserting jurisdiction . . . . [a]nd the court is free to weigh the evidence to determine whether jurisdiction has been established." *United Phosphorus, Ltd. v. Angus Chemical Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds*, *Minn-Chem, Inc. v. Agrium, Inc.,* 683 F.3d 845 (7th Cir. 2012).

### B. Plaintiffs' Status as Activist Voters Asserting Their First Amendment Rights Establishes That They Have Standing.

All ten Plaintiffs filed declarations (Dkt. 24-34) supporting Plaintiffs' arguments opposing the motion to dismiss filed by Fitzgerald and Tiffany,[7] presenting facts that summarize their interests in bringing this suit and explaining why allowing Defendants to remain on the ballot for 2022 elections causes Plaintiffs to suffer injuries that a favorable decision from this Court will remedy. We rely on those declarations in opposing Johnson's motion as well.

For purposes of deciding the threshold standing issue in this case, two sets of facts from the Plaintiffs' declarations are dispositive. First, because Defendants continue to flout Section 3 by insisting on running for re-election notwithstanding their involvement in and promotion of the insurrection against the 2020 election results, Plaintiffs must divert time and effort that they would have otherwise devoted to activism and persuasion on substantive policy issues to combating "The Big Lie" and explaining to voters that Defendants should not be on the ballot at all. (Stencil Decl. ¶ 4; Russler Decl. ¶ 5; Mueller Decl. ¶¶ 4-5; Maranto Decl. ¶¶ 4-5; Lisi Decl. ¶¶ 5-6; Kurz Decl.

---

[7] Not only does the law allow evidence beyond the pleadings to be submitted and considered on a Rule 12(b)(1) motion challenging standing through a lack of subject matter jurisdiction, in this Circuit "[a] motion to dismiss for lack of standing should not be granted unless there are no set of facts consistent with the complaint's allegations that could establish standing." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 498 (7th Cir. 2005). Plaintiffs' declarations submitted with this brief are entirely consistent with their Complaint; by filing them, Plaintiffs have aided the Defendants and the Court by presenting specific and sworn factual evidence when, under *Lac Du Flambeau*, they could simply have asserted those facts in this brief. Even if this were not enough, Plaintiffs could amend the Complaint as of right to include all of the facts stated in their declarations. Against this background, any result other that proceeding directly to the merits of Defendants' challenge to standing based on the facts of record is empty formalism.

¶ 5; DeMuth Decl. ¶ 5; DeMain Decl. ¶¶ 4-6; Botsford Decl. ¶¶ 5-6; Bechen Decl. ¶ 5.) Second, their actions in bringing this lawsuit—and in taking a favorable decision from this Court to other forums if that becomes necessary—implicate their First Amendment right to petition for redress of grievances.

The Supreme Court has made clear that the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). "[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014). Plaintiffs prefer to devote their time to persuading fellow citizens to support their positions on important substantive political issues, but Johnson's potential presence on the ballot for the 2022 elections compels Plaintiffs to spend time discussing and debating Johnson's inflammatory lies and insurrectionist actions, rather than the important substantive public policy issues they would prefer to discuss.

In addition, the First Amendment protects a separate, vital right that supports Plaintiffs' claims in this case: the right to petition the government for redress of grievances. "The right of access to the courts is indeed but one aspect of the right of petition." *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). In *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983), the Supreme Court identified "the [F]irst [A]mendment interests in private litigation—compensation for violated interests, the psychological benefits of vindication, public airing of disputed facts[.]" Violation of these interests demonstrates injury-in-fact. Indeed, the district court in *Greene* recognized "citizens' own First Amendment rights to file complaints regarding the operation of the electoral process that the Challenge Act recognizes." 2022 WL 1136729 at *18.

C.    **Standing is Not a Hypertechnical Requirement That Provides an Excuse to Close Courthouse Doors.**

1.    A Widely Shared Injury Can Be "Particularized."

The law is clear that a widely shared injury can support standing, so long as the requirements of the injury-in-fact test are met. For example, in *Public Citizen v. U.S. Department of Justice*, 491 U.S. 440 (1989), the Supreme Court ruled that a widespread injury established standing: "The fact that other citizens or groups of citizens might make the same complaint after unsuccessfully demanding disclosure under FACA does not lessen appellants' asserted injury, any more than the fact that numerous citizens might request the same information under the Freedom of Information Act entails that those who have been denied access do not possess a sufficient basis to sue." *Id.* at 449-50.

2.    Even Minor Injuries Fully Establish Standing.

Injuries that many people might describe as minor suffice to show standing: "The defendants claim that [plaintiff's] injury is insubstantial, but the 'injury-in-fact necessary for standing need not be large, an identifiable trifle will suffice.'" *Sierra Club v. Franklin County Power of Illinois, LLC*, 546 F.3d 918, 925 (7th Cir. 2008) (quoting *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002)); *see also Doe v. County of Montgomery*, 41 F.3d 1156, 1159 (7th Cir. 1994) ("[A]n identifiable trifle is enough for standing to fight out a question of principle . . . .").

Courts routinely find an "injury," and thus standing, when a defendant's unlawful actions cause a plaintiff to undergo inconvenience, even if that inconvenience is very brief and even if the inconvenience is a product of the plaintiff's own choices. For example, a woman who was unlawfully ejected from an auditorium for five minutes by law enforcement officers suffered an injury sufficient to give her standing: "The Court believes that the five minute timespan that [plaintiff] was barred from the auditorium does not render her legally protected interest

insubstantial." *Marshall v. Town of Merrillville*, 228 F. Supp. 3d 853, 862 (N.D. Ind. 2017). *See also Leung v. XPO Logistics, Inc.*, 164 F. Supp. 3d 1032, 1036-37 (N.D. Ill. 2015) (finding standing based on the plaintiff's voluntary participation in a short telephone survey that the plaintiff claimed violated a federal statute).

The principle that small injuries support Article III standing applies with full force to First Amendment claims. In *American Civil Liberties Union v. City of St. Charles*, 794 F.2d 265 (7th Cir. 1986), the plaintiffs argued they had standing to bring a challenge under the First Amendment's Establishment Clause to a city's placement of a large lighted cross on a public building because "they have been led to alter their behavior—to detour, at some inconvenience to themselves, around the streets they ordinarily use." *Id*. at 268. The Seventh Circuit held that this inconvenience gave them standing:

> The curtailment of their use of public rights of way is similar to the alleged curtailment of the plaintiffs' use of the national parks in *United States v. SCRAP* [citation omitted]. The cost in this case is no doubt slight, but it was even slighter in *SCRAP*, and the willingness of plaintiffs (or even just one of them) to incur a tangible if small cost serves to validate, at least to some extent, the existence of genuine distress and indignation, and to distinguish the plaintiffs from other objectors to the alleged establishment of religion by St. Charles.

*Id*. The *St. Charles* court also ruled that it was irrelevant that the plaintiffs had subjected themselves to the detour. *Id*. at 268-69.

> 3. <u>Diversion of Time and Resources Establishes an Injury for Standing Purposes.</u>

*St. Charles* also follows the rule in First Amendment cases that plaintiffs who incur inconvenience, lost time, or expense because of an alleged violation of the First Amendment have standing. *Id*. Most often, such "diversion of resources" claims are advanced by organizations rather than individuals. For example, in *Crawford v. Marion County Election Board*, 472 F.3d 949 (7th Cir. 2007), the Seventh Circuit held that the Democratic Party had standing to challenge a voter

identification law because the law "injures the [party] by compelling [it] to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote." *Id*. at 951.[8]

In another organizational standing case, *Common Cause Indiana v. Lawson*, the Seventh Circuit held that the plaintiff, an organization that promoted the right to vote, had standing because a state law that purged voter rolls required the plaintiff to spend time, resources and money challenging the law and helping voters who had been incorrectly removed remedy the errors. 937 F.3d 944, 950-51 (7th Cir. 2019). "We are not alone in this assessment. Our sister circuits have upheld the standing of voter-advocacy organizations that challenged election laws based on similar drains on their resources. Like us, they have found that the organizations demonstrated the necessary injury in fact in the form of the unwanted demands on their resources." *Id*. at 952.

Notably, the concurring opinion of Judge Brennan in *Common Cause* recognizes that "[t]he test for organizational standing . . . is the same as that for any other plaintiff: Has the plaintiff demonstrated a concrete, particularized injury to its own interests, or is it complaining of a generalized grievance shared broadly with other members of the public?" *Id*. at 964. This makes perfect sense: individuals, like organizations, can be required by the unlawful actions of a defendant to spend time or devote resources in ways that impair their objectives or cause them to do something they would prefer not to do. Thus, the "diverted resources" rationale of *Crawford*, *Common Cause*, and other organizational standing cases applies with full force to support Plaintiffs' arguments for standing here.

---

[8] Notably, *Crawford* also affirms the principle that even a slight detriment is enough to establish standing: "The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." 472 F.3d at 951.

D. **Plaintiffs Establish Injury-In-Fact.**

Based on these standards, Plaintiffs have shown injury-in-fact. First, they have lost time and resources because Johnson insists on running in the 2022 election cycle despite his participation in acts of insurrection against the Constitution and the United States. In the eloquent words of Plaintiff Margaret DeMuth:

> As a result of the actions of Defendants that discredit the offices they hold, I am compelled to devote time and effort in my political activity to assuring that my fellow citizens are educated on these matters in addition to policy topics. This additional effort is necessary in order to help people feel that citizen action such as voting is worth their time. In recent months of phoning and canvassing neighbors to talk about voting and to learn about what matters to them, I am hearing a fervent concern that politicians are corrupt and cannot be trusted. This detracts from the essential work of understanding the choices that impact voters in the 2022 and future elections. This burden would be greatly relieved if Senator Johnson and Representatives Fitzgerald and Tiffany were disqualified from the ballot.

(DeMuth Decl. ¶ 5; *see also* Stencil Decl. ¶¶ 4-5; Russler Decl. ¶ 5; Mueller Decl. ¶¶ 4-5; Maranto Decl. ¶¶ 4-5; Lisi Decl. ¶¶ 6-7; Kurz Decl. ¶¶ 4-5; DeMain Decl. ¶ 4; Botsford Decl. ¶¶ 5-6; Bechen Decl. ¶¶ 5-6.) This lost-time and lost-resources injury is exactly the same kind of harm found sufficient to confer standing in *St. Charles*, *Crawford*, *Common Cause*, *Marshall*, and *Leung*: because of unlawful conduct by defendants, plaintiffs felt compelled to devote time and resources to dealing with the effects of defendants' conduct rather than on activities they would have preferred to be involved in. Nothing more is required.

Plaintiffs also prove injury-in-fact through this lawsuit and other proceedings they may have to bring if they succeed here. The filing of a challenge to a political candidate's placement on a ballot based on that candidate's involvement in insurrection is protected by the First Amendment. *Greene* recognizes "citizens' own First Amendment rights to file complaints regarding the operation of the electoral process that the Challenge Act recognizes." 2022 WL 1136729 at *18. It does not matter that the district court in *Greene* recognized this right in the

context of a challenge mounted in the Georgia administrative process.[9] If Plaintiffs prevail on the merits of this case and Johnson does not amend his Declaration of Candidacy to make his representations about eligibility required by Wis. Stat. §8.21(2)(c) accurate, then Plaintiffs will initiate proceedings before the Wisconsin Election Commission ("WEC") or the state courts of Wisconsin to enforce this Court's judgment. As we demonstrate in greater detail in Section III of this brief and in our opposition to the motion to dismiss filed by Johnson's co-defendants (Dkt. 23, pp. 22-28), enforcing a judgment from this Court in Plaintiffs' favor in some other forum does not transform this case into a quest for an advisory opinion. Nor does it diminish the injury that plaintiffs have suffered.

### E. Plaintiffs Assert a Causal Relationship Between Defendants' Insurrectionist Acts and Their Injuries.

The second element of Article III standing requires Plaintiffs to demonstrate "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiffs filed this case as a direct consequence of Johnson's running for re-election to Congress despite his insurrectionist conduct. Although the conspiracy that Johnson helped orchestrate involved many other people, Plaintiffs are not suing those other people. They are suing the three individuals whose presence on the ballot is causing **them** to spend time explaining to

---

[9] Plaintiffs did not bring this challenge before WEC in the first instance because they have no rights to discovery under Wis. Stat. §5.05(2m) and no control over the investigation conducted into a complaint under Wis. Stat. §5.05(2). Further, Wis. Stat. §5.06 does not authorize a complaint because, as of now, no "election official" has acted or failed to act with respect to Defendants' ballot eligibility. In any event, even if WEC were empowered to adjudicate Plaintiffs' Constitutional claims, they are still entitled to a federal forum for those claims. *See Zwickler v. Koota*, 389 U.S. 241, 248 (1967).

voters the grievous harm that was done by Defendants' participation in the insurrection. The requisite causal relationship is present.

### F.     Plaintiffs Assert Injuries that This Court Can Redress.

The redressability requirement of standing requires that Plaintiffs "only show that the requested relief will likely cure the alleged injury . . . . Put differently, the plaintiffs must show that they would benefit in a tangible way from the district court's intervention." *Krislov v. Rednour*, 226 F.3d 851, 858 (7th Cir. 2000). "[E]ven if [Plaintiffs] would not be out of the woods, a favorable decision would relieve their problem 'to some extent,' which is all the law requires." *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 903 (10th Cir. 2012).

Depending on how Johnson responds to a decision in Plaintiffs' favor, that decision alone might give Plaintiffs everything they want. As part of his Declaration of Candidacy required by Wisconsin law, Johnson must swear under oath that he "otherwise qualif[ies] for office if nominated and elected." Wis. Stat. §8.21(2)(c). If this Court issues a judgment that Johnson engaged in insurrection in violation of Section 3 of the Fourteenth Amendment, he will be ineligible to hold the offices to which he seeks re-election. Such a judgment should cause Johnson to amend his Declaration of Candidacy to reflect his ineligibility. "A declaratory judgment should be sufficient, as no government official—including the President—is above the law, and all government officials are presumed to follow the law as has been declared." *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F.Supp. 3d 541, 549 (S.D.N.Y. 2018), *cert. granted, judgment vacated on other grounds sub nom. Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S.Ct. 1220 (2021).

Alternatively, Johnson might not voluntarily admit that he is ineligible for office even if this Court rules in Plaintiffs' favor. Depending on Johnson's course of action after entry of judgment, Plaintiffs could seek to enforce the judgment in proceedings before the WEC or a

Wisconsin circuit court. This Court's judgment would have a preclusive effect before another tribunal because this case gives Defendants a full opportunity to litigate the issue whether they violated Section 3 of the Fourteenth Amendment. *See, e.g., Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co.*, 649 F.3d 539, 547 (7th Cir. 2011). That preclusive effect, in turn, is sufficient to make Plaintiffs "benefit in a tangible way" under *Krislov* from a decision in their favor, and thus also sufficient to establish redressability.

Plaintiffs have standing to proceed.

## III. ARTICLE I, SECTION 5 OF THE CONSTITUTION DOES NOT DIVEST THIS COURT OF JURISDICTION.

Like his co-defendants, Johnson asserts that the Court lacks jurisdiction to hear this case because Article I, Section 5 of the Constitution (the "Qualifications Clause") vests exclusive authority in Congress to disqualify **its members**. (Def. Br. 12-15.) Just as Johnson does in the brief supporting his motion (Def. Br. 11), Plaintiffs seek to avoid repeating arguments from previously filed briefs so in the first instance Plaintiffs refer and incorporate by reference Section II of their opposition brief to the motion to dismiss filed by Congressmen Fitzgerald and Tiffany (Dkt. 23, pp. 16-22) in response to Johnson's argument under the Qualifications Clause. But some level of summary will help make sense of Johnson's arguments.

Just like Fitzgerald and Tiffany's invocation of the Qualifications Clause, Johnson wrongly assumes that Plaintiffs seeks to have him expelled from membership in the 117th Congress due to his violation of Section 3 of the Fourteenth Amendment. But this case is about Johnson's right to access the ballot in the 2022 election and to become part of the 118th Congress next year. As Plaintiffs amply demonstrate in opposition to Fitzgerald and Tiffany's motion to dismiss, ballot access is a matter primarily governed by state law pursuant to Article I, Section 4 of the U.S. Constitution, a provision Johnson fails to mention anywhere in his brief. As a candidate, Johnson

must file by June 1, 2022 his "Declaration of Candidacy" with the Wisconsin Elections Commission ("WEC") swearing under oath that he is qualified to run for the Senate. *See* Wis. Stat. §8.21(2)(a-c). By adjudicating the qualification issue, this Court—the tribunal best situated to address a federal constitutional question—can enter a judgment that is personal to Johnson affecting what he can (or cannot) declare in this statutorily-required Declaration of Candidacy.[10]

Johnson's reliance on cases that affirm Congress' right to be the sole authority on its membership once an election occurs (Def. Br. 12-13) are thus of no moment. For example, *Powell v. McCormack* involved a dispute over Adam Clayton Powell's right to be seated in the U.S. House of Representatives due to various allegations of misconduct and the authority of Congress under Article I, Section 5 to take action **after** Powell had been elected. 395 U.S. 486, 489 (1969). Similarly, *Barry v. U.S. ex rel. Cunningham*, 279 U.S. 597, 619 (1929) implicated the U.S. Senate's power to issue subpoenas under Article I, Section 5 to adjudicate an assertion of someone "claiming the right of membership" to the Senate **after** an election because the Qualifications Clause empowered the body to be the judge of "the elections, returns and qualifications of its 'members'." The decisions affirming the role of Congress under Article I, Section 5 in *Morgan v. United States*, 801 F.2d 445, 447 (D.D.C. 1986) and *McIntyre v. Fallahay*, 766 F.2d 1078, 1081 (7th Cir. 1985) are equally unremarkable: no one disputes that Congress can refuse to seat someone elected or expel them from the body pursuant to Article I, Section 5 **after** an election occurs.[11] The

---

[10] We refer the Court to **Exhibit B** to Plaintiffs' Brief in Opposition to Motion to Dismiss of Defendants Thomas P. Tiffany and Scott L. Fitzgerald, which is the Declaration of Candidacy form Johnson (and his co-defendants) must complete to obtain access to a Wisconsin ballot this fall. (Dkt. 23, Ex. B.) As of May 11, 2022, neither Johnson nor Congressman Fitzgerald had filed their declarations, even though Congressman Tiffany had. *See* WEC Candidate Tracker, https://elections.wi.gov/sites/elections/files/2022-05/Candidates%20Tracking%20By%20Office%20as%20of%205.11.2022.pdf, last accessed May 13, 2022.

[11] Of course, in Johnson's zeal to express the plenary authority of Congress, he forgets to qualify that the body's authority to adjudicate and serve as the arbiter of membership after an election is itself subject to

Sixth Circuit's undeveloped decision in *Lyons v. Sundquist*, 41 F. App'x 832, 832 (6th Cir. 2002) cited by Johnson (Def. Br. 13-14) is no different: federal courts are loathe to get involved **after** an election to determine who of two competing candidates should be seated in Congress.

The actual question before the Court is whether the Qualifications Clause divests this Court of jurisdiction **before the election**. On this point, Johnson undermines his position when he cites to *Roudebush v. Hartke*, 405 U.S. 15, 19 (1972). (Def. Br. 13.) For one, like all of Johnson's authority, *Roudebush* involved a post-election challenge—this one to Indiana's recount procedures as applied in the 1970 election for Senate. *Id*. at 18. More critically, *Roudebush* rejects the idea that Congress has plenary authority over the election process. Reversing the district court's decision finding that Indiana's recount procedures improperly interfered with Congress' authority under the Article I, Section 5, the Supreme Court determined:

> Unless Congress acts, Art. I, 4, empowers the States to regulate the conduct of senatorial elections. (Citation omitted.) This Court has recognized the breadth of those powers: "It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932).

*Roudebush*, 405 U.S. at 24.

Just like Indiana, Wisconsin has authority to regulate the "Times, Places, and Manner" of elections under Article I, Section 4 of the U.S. Constitution. As recently reiterated in the decision denying Representative Greene's motion seeking to enjoin a state proceeding questioning her

---

due process considerations by the courts. *See e.g., Cunningham*, 279 U.S. at 620 ("[T]he question under consideration concerns the exercise by the Senate of an indubitable power; and if judicial interference can be successfully invoked it can only be upon a clear showing of such arbitrary and improvident use of the power as will constitute a denial of due process of law.")

qualifications under Section 3, "[t]he U.S. Constitution assigns responsibilities to both Congress and the states with respect to the election of congressional candidates." *Greene*, 2022 WL at *26 (citing *Hutchinson v. Miller*, 797 F.2d 1279, 1284 (4th Cir. 1986) (acknowledging the "shared responsibility for the legitimation of electoral outcomes" between Congress and the states)). The power of the states to regulate the election "has been interpreted broadly." *Id.*

The Supreme Court has itself confirmed the interest of each state in "avoiding 'voter confusion, ballot overcrowding, or the presence of frivolous candidacies,' in 'seeking to assure that elections are operated equitably and efficiently,' and in 'guarding against irregularity and error in the tabulation of votes[.]'" *U.S. Term Limits v. Thornton*, 514 U.S. 779, 834 (1995) (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95 (1986)). Indeed, multiple courts recognize the power of each state to exclude candidates not qualified to run. *See Greene*, 2022 WL at *26; *Hassan v. Colorado*, 495 F. App'x 947, 948 (10th Cir. 2012); *Lindsay v. Bowen*, 750 F.3d 1061, 1064 (9th Cir. 2014). As the Tenth Circuit, speaking through then-Circuit Judge Neil Gorsuch, held in *Hassan*: "a state's legitimate interest in protecting the integrity and practical functioning of the political process permits it to exclude from the ballot candidates **who are constitutionally prohibited from assuming office**." *Id*. at 948. (Emphasis added.) To hold otherwise would "invite the possibility that fraudulent or unqualified candidates such as minors, out-of-state residents, or foreign nationals could be elected to Congress—and the state would be powerless to prevent it from happening." *Greene*, 2022 WL at *27. Under Johnson's Article I, Section 5 theory, even Vladimir Putin's qualifications and ballot access of could not be challenged at this point in the process.

Because Wisconsin has constitutional authority to assess each candidate's qualifications, Plaintiffs fully embrace Senator Johnson's assertion that compliance with Section 3 of the

Fourteenth Amendment constitutes an additional **qualification** for him to be in Congress. (Def. Br. 13.) The fact that the House of Representatives invoked Section 3 in refusing to seat Milwaukee's very own Victor Berger in 1935 or that the Senate analyzed insurrection after the Civil War in relation to North Carolina's Confederacy-era Governor Zebulon Vance (Def. Br. 14) is not dispositive. It simple supports the idea that **once an election occurs**, Congress can refuse to seat those who it adjudicates to be disqualified under the Qualifications Clause. Absent from Senator Johnson's argument is **any** consideration of Wisconsin's authority under Article I, Section 4 to determine in the first instance whether someone is qualified to be on the ballot. Johnson ignores this fundamental fact because it does not square with the simplistic jurisdictional argument he seeks to make under Article I, Section 5. In sum, the Qualifications Clause does not limit this Court's jurisdiction in a ballot access challenge such as this one.

Accordingly, Johnson's undeveloped argument over advisory opinions fails.[12] (Def. Br. 15.) For one, Plaintiffs are not asking the Court for an advisory opinion to "bind **Congress**." As explained in opposition to the motion to dismiss filed by Johnson's co-defendants, a declaratory judgment here will bind **Defendants** and govern how they will be required to proceed with their sworn Declarations of Candidacy. Thus, Johnson's assertion that a decision on the merits here will be nothing more than a "nonbinding pronouncement that does not affect the rights of the litigants in the case" is simply false. (Def. Br. 15.) To the contrary, a declaratory judgment here finding that Senator Johnson engaged in insurrection will bind him personally and he will need to comply with that judgment as he navigates in a non-perjurious manner his Declaration of Candidacy. Similarly, if he were to prevail in the litigation and obtain a judgment declaring that his conduct did not

---

[12] We incorporate by reference Section III of Plaintiffs' brief in opposition to Defendants Fitzgerald and Tiffany's motion to dismiss, which specifically addresses the advisory opinion argument advanced by Defendants. (Dkt. 23, pp. 22-26.)

constitute insurrection within the meaning of Section 3 of the Fourteenth Amendment, he would be free to maintain his assertions of qualification in the Declaration of Candidacy without interruption. There is nothing advisory about what Plaintiffs seek.[13]

## IV.    THE AMNESTY ACT OF 1872 DOES NOT APPLY TO SENATOR JOHNSON.

Although Johnson quotes the language of the Amnesty Act of 1872 (Def. Br. 16), his argument proceeds to ignore those words, as well as the history of the Act, the scholarly commentary on it, and the most persuasive decision that has addressed whether the Amnesty Act overrode the barrier to insurrectionists imposed by Section 3. Essentially, Johnson wants this Court to ignore established methods of interpretation, historical evidence and analysis, and well-reasoned precedent in order to follow the lead of one wayward district court that took a colleague's side on this issue, but got it woefully wrong.

We begin with the pertinent text of the Amnesty Act:

> All political disabilities imposed by the third section of the fourteenth article of amendments of the Constitution of the United States are hereby removed from all persons whomsoever, except Senators and Representatives of the thirty-sixth and thirty-seventh Congresses, officers in the judicial, military, and naval service of the United States, heads of departments, and foreign ministers of the United States.

*See* Act of May 22, 1872, ch. 193, 17 Stat. 142 (1872).

We must also consider the history that Johnson leaves out. The Amnesty Act was the product of dissatisfaction with the original legislative process of allowing former Confederates to hold political offices through the passage in Congress of repeated "private bills" that named hundreds and then thousands of individuals, who were thereby relieved of the restrictions imposed

---

[13] Senator Johnson sneaks in a passing reference to the political question doctrine when citing to *Roudebush*. (Def. Br. 13.) The Court should ignore this undeveloped argument. But if the Court considers it, Plaintiffs rely on their argument in Section V of their brief opposing Fitzgerald and Tiffany's motion to dismiss and incorporate it here by reference. That argument demonstrates why the questions raised by Plaintiffs' claims are justiciable and not subject to the political question doctrine. (Dkt. 23, pp. 27-28.)

by Section 3. *See* Magliocca, 36 Constitutional Commentary at 112-113. This process was viewed as both unwieldy and unfair, and the mounting individual requests for amnesty through private bills "soon overwhelmed Congress and led to calls for general Section Three amnesty legislation." *Id*. at 112.

One of the last private bills taken up by Congress before the Amnesty Act passed initially contained some 16,000 or 17,000 names, and was then amended to add twenty-five more pages of names. Cong. Globe, 42nd Cong., 2nd Sess. 3381-82 (1872) (remarks of Rep. Butler). Members kept adding names to the list, which prompted one member to propose adding the words "and all other persons" to the private bill. *Id*. at 3382 (remarks of Rep. Perry). The bill's sponsor rejected this proposal, because he believed those words suggested that amnesty would be extended to persons who had not yet engaged in conduct that resulted in their disqualification under Section 3, remarking that he "did not want to be amnestied himself." *Id*. at 3382 (remarks of Rep. Butler). The fact that this quip was greeted by laughter on the House floor, *id.*, demonstrates that the very same argument Johnson presses before this Court now was not taken seriously in 1872, when the Amnesty Act was passed. Johnson's argument has no support in the historical record surrounding the passage of the Act.

This conclusion is further bolstered by the language of the Amnesty Act itself. As the district court ruled[14] in *Greene*:

---

[14] Grasping at straws, Johnson contends that because the *Greene* court ruled that it had no jurisdiction to decide Representative Greene's separate cause of action under the Amnesty Act of 1872, its analysis showing why the Act did not bar the ballot challenges against her "is dicta and amounts to an advisory opinion." (Def. Br. 16-17 n.4.). This ignores the *Greene* court's statement that it "still may consider certain arguments Plaintiff has made regarding the 1872 Act in the context of Plaintiff's remaining constitutional claims." 2022 WL 1136729 at *9. The court went on to consider Greene's argument based on the 1872 Act in the context of her claim that Georgia "would not have a legitimate interest in imposing nonexistent qualifications on candidates for federal office," *id*. at *22, because under Greene's interpretation of the 1872 Act the qualification imposed by Section 3 no longer existed. *Id*. Therefore, the *Greene* court's analysis of the 1872 Act was neither dicta nor an advisory opinion.

> [T]he text of the statute contains no language suggesting that it applies prospectively. For instance, it does not say that it removes all future disabilities, disabilities that may be incurred, disabilities that shall be incurred, or the like. Although Section 3 itself utilizes the future perfect tense by applying its restriction to any individual who "*shall have engaged* in insurrection or rebellion," the 1872 Amnesty Act utilizes only the past tense phrase that "all political disabilities imposed by the third section of the fourteenth article are hereby removed from all persons whomsoever . . . ." Moreover . . . it strains credulity to argue that Congress can "remove" something that does not yet exist.

2022 WL 1136729 at *23 (emphasis in original). Johnson simply ignores the fact that the Act is phrased in the past tense. Use of the present tense "include[s] the future as well as the present," *Carr v. United States*, 560 U.S. 438, 448 (2010), while use of the past tense implies that a statute applies to pre-enactment conduct. *See Gundy v. United States*, 139 S. Ct. 2116, 2127 (2019).

Ignoring history and statutory text, Johnson puts all of his chips on the district court's decision in *Cawthorn v. Circosta*, 2022 WL 738073 (E.D.N.C., Mar. 10, 2022),[15] which also inexplicably ignores the unmistakable choice of Congress to use the past tense only in granting the 1872 amnesty. Instead, the *Cawthorn* court focused on arguments made to Congress in the case of Congressman Victor Berger, a World War I-era representative from Milwaukee whose right to hold office was challenged under Section 3 because of his purported aid to the United States' enemies during the war. Notably, the *Cawthorn* court did not heed the conclusion of the committee investigating Berger that "Congress has no power whatever to repeal a provision of the Constitution by a mere statute." 6 Clarence Cannon, Cannon's Precedents of the House of Representatives 55 (1935).[16] That district court in *Cawthorn* also ignored the committee's conclusion that the part of Section 3 that allows Congress to remove the insurrection disqualification "could only remove disabilities incurred previously to the passage of the act, and

---

[15] The *Cawthorn* decision was appealed to the Fourth Circuit, which heard oral argument on May 3, 2022.

[16] https://www.govinfo.gov/content/pkg/GPO-HPREC-CANNONS-V6/pdf/GPO-HPREC-CANNONS-V6.pdf#page=75.

Congress in the very nature of things would not have the power to remove any future disabilities." *Id*.

In *Greene*, of course, the district court succinctly ruled why Johnson's argument here based on *Cawthorn* must fail: "To summarize, if the reading suggested by [Greene] and the court in *Cawthorn* were correct, the 1872 Amnesty Act would have both applied prospectively to remove disabilities that did not yet exist and, together with the 1898 Act, effectively repealed a constitutional provision by statute—both of which, as the Berger Committee recognized, Congress cannot do." 2022 WL 1136729 at *24.

Last, Johnson's use of the Amnesty Act as a path for an end run around the Constitution runs into a roadblock imposed by two decisions of the United States Supreme Court. In *U.S. Term Limits*, the court referred to Section 3 and other Constitutional provisions, noting that "[b]ecause those additional provisions **are part of the text of the Constitution**, they have little bearing on whether Congress and the States may add qualifications to those that appear in the Constitution." *Id*., 514 U.S. at 787 n.2. And in *Powell*, the Supreme Court acknowledged—using the present tense – that Section 3 "disqualifies" anyone who performs the acts identified in its prohibition on holding office. *Id.*, 395 U.S. at 520 n.41. If Johnson is right and the 1872 Amnesty Act repealed Section 3, the Supreme Court missed the news. Johnson's Amnesty Act argument must be rejected.

## V.   PLAINTIFFS' PROPERLY SEEK A DECLARATION THAT WILL BENEFIT THEM BY GIVING THEM A REMEDY.

Johnson is flat-out wrong when he claims that "Plaintiffs have no protected interest in the disqualification process under [the] Disqualification Clause . . . to support a declaratory judgment claim." (Def. Br. 18.) The district court in *Greene* ruled to the contrary: citizens have their "own First Amendment rights to file complaints regarding the operation of the electoral process that the Challenge Act recognizes." 2022 WL 1136729 at *18. In addition to their right to petition,

Plaintiffs show in Section II above that they have standing under the First Amendment because Johnson and the other Defendants continuing to seek ballot placement despite their insurrectionist conduct diverts their scarce time and attention from substantive political engagement to the Defendants' ineligibility to run.

It doesn't matter that a declaratory judgment from this Court that Johnson violated Section 3 will not automatically disqualify him from the ballot. A plaintiff "need not show that a favorable decision will relieve his **every** injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis in original). A judgment that Johnson is an insurrectionist within the meaning of Section 3 has significant power: it would require him to amend or withdraw his Declaration of Candidacy filed with the WEC, and if he did not do so, Plaintiffs have a valuable weapon in any proceedings before WEC or the state courts.

Johnson admits that the arguments he advances for dismissal in the final section of his brief track his arguments that Plaintiffs have no private right of action to pursue in this Court. (Def. Br. 18.) We demonstrate in Section I of this brief why Johnson is wrong on that issue, and instead of repeating those arguments here we incorporate them by reference.

## CONCLUSION

For the reasons set forth in this brief, Defendants' motion to dismiss should be denied with the case placed on an expedited docket to adjudicate the merits of Plaintiffs' claim.

Dated this 13th day of May 2022.

LAFFEY, LEITNER & GOODE LLC
Counsel for Plaintiffs

*s/ Mark M. Leitner*
Mark M. Leitner
State Bar No. 1009459
Joseph S. Goode
State Bar No. 1020886
325 E. Chicago Street

Suite 200
Milwaukee, WI 53202
(414) 312-7003 (telephone)
(414) 755-7089 (facsimile)
<u>mleitner@llgmke.com</u>
<u>jgoode@llgmke.com</u>